J-S38017-15
J-S38018-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: M.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M.M. AND J.W.M. | No. 253 MDA 2015 |

Appeal from the Order entered January 13, 2015,
in the Court of Common Pleas of York County, Juvenile
Division, at No: CP-67-DP-0000228-2012

| IN THE INTEREST OF: R.A.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M.M. AND J.W.M. | No. 254 MDA 2015 |

Appeal from the Order entered January 13, 2015,
in the Court of Common Pleas of York County, Juvenile
Division, at No: CP-67-DP-0000229-2012

| IN THE INTEREST OF: J.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M.M. AND J.W.M. | No. 255 MDA 2015 |

Appeal from the Order entered January 13, 2015,
in the Court of Common Pleas of York County, Juvenile
Division, at No: CP-67-DP-0000230-2012

| IN RE: ADOPTION OF: S.L.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M.M. AND J.W.M. | No. 256 MDA 2015 |

Appeal from the Order entered January 13, 2015,
in the Court of Common Pleas of York County, Juvenile
Division, at No: CP-67-DP-0000231-2012

J-S38017-15
J-S38018-15

| IN RE: ADOPTION OF: S.L.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M.M. & J.W.M. | No. 325 MDA 2015 |

Appeal from the Decree entered January 13, 2015,
in the Court of Common Pleas of York County, Orphans'
Court, at No: 2014-0023

| IN RE: ADOPTION OF: R.A.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M.M. & J.W.M. | No. 326 MDA 2015 |

Appeal from the Decree entered January 13, 2015,
in the Court of Common Pleas of York County, Orphans'
Court, at No: 2014-0022

| IN RE: ADOPTION OF: J.M.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M.M. & J.W.M. | No. 327 MDA 2015 |

Appeal from the Decree entered January 13, 2015,
in the Court of Common Pleas of York County, Orphans'
Court, at No: 2014-0020

| IN RE: ADOPTION OF: M.F.M. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M.M. & J.W.M. | No. 328 MDA 2015 |

Appeal from the Decree entered January 13, 2015,
in the Court of Common Pleas of York County, Orphans'
Court, at No: 2014-0021

J-S38017-15
J-S38018-15

BEFORE: WECHT, STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:         **FILED AUGUST 21, 2015**

R.M.M. (Mother) and J.W.M. (Father) (collectively, Appellants) appeal from the orders entered January 13, 2015, in the Court of Common Pleas of York County, which changed the permanency goal to adoption with respect to their four minor children, M.F.M., a female born in May 1997; R.A.M., a male born in December 1998; J.M.M., a female born in October 2000; and S.L.M., a female born in August 2003 (collectively, the Children). In addition, Appellants appeal from the decrees entered that same day, which terminated their parental rights to the Children involuntarily.[1] We affirm.

On December 27, 2012, the York County Office of Children, Youth, and Families (CYF) filed applications for emergency protective custody of the Children. In its applications, CYF alleged that the police were called to Appellants' home on December 21, 2012. Application for Emergency Protective Custody, 12/27/12, at 3. Upon arriving, the officers discovered that the residence "was extremely dirty with numerous animals running about and the house smelled of animal excrement . . . ." *Id.* Specifically, the home contained "a pig, several lizards, snakes, rabbits, a dog, a cat,

---

[1] The appeals from the trial court's goal change orders at 253 MDA 2015, 254 MDA 2015, 255 MDA 2015, and 256 MDA 2015, were consolidated *sua sponte* by this Court on March 24, 2015. The appeals from the decrees terminating Appellants' parental rights at 325 MDA 2015, 326 MDA 2015, 327 MDA 2015, and 328 MDA 2015, were consolidated *sua sponte* on April 14, 2015. We address both matters in this combined memorandum for ease of disposition.

- 3 -

several hamsters, large rats, ferrets, and birds . . . ." *Id.* at 3-4. Officers also observed maggots in the home, as well as several sexual devices, which were lying out in the open. *Id.* The Children were very dirty and stated that they had not bathed in two weeks. *Id.* at 4. The Children were transported to the hospital by ambulance. *Id.* During the trip, M.F.M. indicated that the Children were homeschooled, but that J.M.M. and S.L.M. could not read or write. *Id.* M.F.M. also reported that the Children were not permitted to have contact with anyone outside the home. *Id.*

The applications further alleged that the Children were examined at the hospital, and that all of them were found to be in various states of intoxication. *Id.* at 5. The Children explained they became intoxicated after Appellants provided the Children with beer, reportedly to get the Children to fall asleep, and/or to "celebrate the pagan holiday, Yule." *Id.* at 4. At some point, Father assaulted J.M.M. *Id.* Appellants then informed the Children that they were going to Walmart, and left the residence. *Id.* As a result of these allegations, the police took protective custody of the Children. *Id.* CYF was awarded temporary custody of the Children by verbal order of the Honorable Harry M. Ness on December 22, 2012. *Id.*

On December 27, 2012, Judge Ness reaffirmed his prior verbal order awarding custody of the Children to CYF. A shelter care hearing was held on January 11, 2013, during which Appellants consented to the Children remaining in foster care. N.T., 1/11/13, at 6. Judge Ness also stated that

- 4 -

there would be no visits between Appellants and the Children because a criminal investigation against Appellants was ongoing. *Id.* at 9. CYF filed dependency petitions on January 30, 2013. A dependency hearing was held on February 12, 2013, during which Appellants agreed that the Children should be adjudicated dependent based on the environmental and educational concerns raised by CYF. N.T., 2/12/13, at 5. Judge Ness then ordered that visitation between the Children and Appellants would not be permitted until further order of court, due again to the ongoing criminal investigation.[2] *Id.* at 19.

On March 10, 2014, CYF filed petitions to change the Children's permanency goals to adoption, as well as petitions to terminate the parental rights of Mother and Father involuntarily. On April 3, 2014, Appellants filed an answer to the CYF petitions. As part of their answer, Appellants included a petition for the recusal of Judge Ness, in which they alleged that Judge Ness made inappropriate comments during a permanency review hearing on November 25, 2013. By order dated July 29, 2014, Judge Ness granted the petition for recusal, and this matter was reassigned to the Honorable Andrea Marceca Strong.

---

[2] Judge Ness loosened this restriction during a March 28, 2013 status hearing, by permitting Appellants to send the Children letters, which first would be screened by CYF to ensure that Appellants did not say anything inappropriate. N.T., 3/28/13, at 21.

A goal change and termination hearing was held on October 29, 2014 and October 30, 2014. During the hearing, the trial court heard the testimony of social worker, Dr. Kathy Minnich; therapists, Lisa MacKillop, Jessica Green, and Lori Cape; school counselor, Nancy Rossi; CYF caseworker, Jessica Jones; Mother's parole officer, Rikki Martin; Mother; and Father. The court also interviewed all four of the Children *in camera*, in the presence of the parties' attorneys. On January 13, 2015, the court entered its orders changing the Children's permanency goal to adoption, as well as its decrees terminating the parental rights of Mother and Father to the Children. Mother and Father timely filed notices of appeal on February 9, 2015, along with concise statements of errors complained of on appeal.[3]

---

[3] It appears that Appellants filed one notice of appeal and concise statement of errors complained of on appeal per child, each of which included the docket numbers for both the change of goal and termination matters. On February 18, 2015, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a), in which it indicated that Mother and Father mistakenly filed their notices of appeal and concise statements with the clerk of courts, rather than the orphans' court. Trial Court Opinion, 2/18/15, at 2. The court stated that it would forward the notices of appeal and concise statements to the orphans' court, subject to an additional filing fee. *Id.* We emphasize that it was improper for Appellants to file a single notice of appeal as to each child, rather than file a notice of appeal as to each termination decree and goal change order. *See* Pa.R.A.P. 341, Note ("Where, however, one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."). However, we decline to quash Appellants' appeal, as we discern no prejudice stemming from Appellants' procedural misstep. In addition, we note that Appellants' notices of appeal were timely filed in the orphans' court, even though they were not forwarded to the orphans' court until February 18, 2015. *See* Pa.R.A.P. 905(a)(4) ("If a notice of appeal is . . . filed in an incorrect office within the unified judicial system, the clerk shall immediately stamp it with

Appellants now raise the following issue for our review: "Did the trial court abuse its discretion or commit[] an error of law in granting the petition for involuntary termination of parental rights and petition for change of goal?"[4]  Appellants' Brief at 8 (unnecessary capitalization omitted).

We consider Appellant's claim mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

---

the date of receipt and transmit it to the clerk which entered the order appealed from, and upon payment of an additional filing fee the notice of appeal shall be deemed filed in the trial court on the date originally filed.").

[4] While Appellants purport to challenge the orders changing the Children's permanency goals to adoption, their brief on appeal contains no substantive discussion of this issue, nor does it contain any citation to relevant authority. Accordingly, Appellants have failed to preserve any challenge to the change of goal orders for our review, and we address only the decrees terminating Appellants' parental rights.  *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Appellants' parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating Appellants' parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that

cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, Appellants argue that the trial court erred or abused its discretion by terminating their parental rights to the Children. Appellants' Brief at 14-19. Appellants contend that it was impossible for them to achieve reunification due to the no-contact order put in place by Judge Ness prior to his recusal, and that the trial court "failed to afford proper consideration" to these circumstances. *Id.* at 14-15, 19. Appellants further argue that Judge Ness erred by refusing to appoint separate counsel for each parent. *Id.* at 20.

The trial court concluded that it was "at best, speculative" that Appellants ever could make the changes in their lives necessary to care for the Children, and that returning the Children to Appellants' care would result in instability and emotional damage. Trial Court Opinion, 1/9/15, at 23, 38. The court found, *inter alia*, that Appellants have not taken responsibility for their actions, and for the harm they have caused to the Children. *Id.* With respect to Appellants' claim that they should have received separate counsel, the trial court emphasizes that Appellants never requested separate counsel. Trial Court Opinion, 2/18/15, at 6.

- 10 -

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion by involuntarily terminating Appellants' parental rights to the Children. During the termination hearing, CYF caseworker, Jessica Jones, testified that both Appellants received sentences of incarceration as a result of their actions with respect to the Children. N.T., 10/29/14-10/30/14, at 38-39. Mother pled guilty to four counts of endangering the welfare of a child, and received a sentence of 11½ to 23 months' incarceration with credit for time served. *Id.* at 38-39. Mother was incarcerated from May 25, 2013 until June 13, 2014. *Id.* at 39. Father pled guilty to four counts of endangering the welfare of a child, as well as one count of simple assault, and also was incarcerated on May 25, 2013. *Id.* At the time of the termination hearing, Father remained incarcerated. *Id.* at 40. Mother currently resides in a one-room apartment, which shares a kitchen, bathroom, and living area with other tenants. *Id.* at 41. Mother receives disability payments, and Ms. Jones believed that these payments result from Mother's mental health issues. *Id.* at 42.

Ms. Jones further testified that CYF created a series of family service plans aimed at addressing Appellants' mental health and parenting concerns. *Id.* at 35-37. With respect to Mother's mental health, Mother received a psychological evaluation in 2012, prior to being incarcerated. *Id.* at 106-07. In addition, CYF received a mental health treatment plan from T.W. Ponessa on September 18, 2014. *Id.* at 82. However, CYF had not yet received any

- 11 -

documentation indicating that Mother had followed through with her recommended treatment. *Id.* It also was reported that Father received mental health treatment prior to being incarcerated, and that he completed a psychological evaluation, but CYF did not receive any documentation to confirm this. *Id.* at 106, 201-02.

Officer Rikki Martin testified that she works for York County Adult Probation, and that she has been supervising Mother since she was paroled in June 2014. *Id.* at 96. Officer Martin explained that a condition of Mother's parole was to undergo a mental health evaluation, which Mother completed on July 10, 2014. *Id.* at 97-98. As a result of this evaluation, it was recommended that Mother continue with regular outpatient counseling. *Id.* at 98. Officer Martin stated that she contacted Mother's counselor, and that Mother reportedly missed her most recent appointment in October 2014. *Id.* at 99. Further, Mother had not attended counseling since September 2014. *Id.* Officer Martin admitted that she was unaware how often Mother's counseling appointments are scheduled, but explained that Mother has failed to provide her with a signed release, despite several requests, that would have allowed Officer Martin to acquire this information. *Id.* at 100-01.

Dr. Kathy Minnich testified that she is a social worker at Northeastern School District, where J.M.M. and S.L.M. are enrolled. *Id.* at 12-14. At the time of the hearing, J.M.M. was in the sixth grade, but read at a third grade

level. *Id.* at 16. When S.L.M. first was enrolled in school, she was placed in the third grade, but "at that point she didn't even know all of her letters . . . ." *Id.* at 16. At the time of the hearing, S.L.M. was in the fourth grade, and read at approximately a second grade level. *Id.* at 25-26. Dr. Minnich explained that J.M.M. and S.L.M reported little prior schooling experience, and emphasized that their educational deficits are not due to a lack of cognitive ability, but due to "a lack of exposure." *Id.* at 13-14, 22, 31-32. Dr. Minnich stated that J.M.M. and S.L.M. are continuing to "make gains at an impressive level," and that they there are "thriving." *Id.* at 14-15.

Ms. Nancy Rossi testified that she is a school counselor at Central York Middle School, where R.A.M. formerly was enrolled. *Id.* at 252, 258-59. Ms. Rossi explained that R.A.M. was operating approximately three to four years behind his peers at the time he began school. *Id.* at 252-53. When R.A.M. entered the eighth grade, it was determined that he was reading at about a third grade level. *Id.* at 255. During this time, R.A.M. struggled with stress and anxiety, and occasionally became overwhelmed. *Id.* at 254-57. Ms. Rossi explained that R.A.M. became "extraordinarily anxious and emotional" if he began to focus on his past experiences, and that he "would sometimes melt down and not be able to do anything." *Id.* at 254-58. Nonetheless, R.A.M. was able to overcome these difficulties and pass the eighth grade. *Id.* at 258-59.

Dr. Lisa MacKillop testified that she provided therapy for M.F.M., J.M.M., and S.L.M., and that none of these children has been fully able to process the trauma they experienced while residing with Appellants.[5] *Id.* at 142. J.M.M. has expressed that she remains fearful that she will be hit when others yell at her. *Id.* at 128. J.M.M. stated that this fear stems from her experience with Appellants. *Id.* Similarly, S.L.M. reported to Ms. MacKillop that she has difficulty feeling safe and trusting others, due to the way she was treated while residing in her prior home. *Id.* at 125. Dr. MacKillop observed that M.F.M. suffers from difficulty developing trust, tends to be irritable, and has difficulty expressing her frustrations. *Id.* at 123. M.F.M. did not state that these difficulties resulted from her time in Appellants' care, however. *Id.* at 123-24.

Therapist Jessica Green testified that she began providing therapy for R.A.M. in September 2013. *Id.* at 155. R.A.M. does not like to discuss his experiences while living with Appellants, and R.A.M. reports that discussing his past puts him in a bad mood. *Id.* at 150-51, 158. Ms. Green noted that R.A.M. has displayed "increased maladaptive behaviors around [the] time of court surrounding anything to do with his parents." *Id.* at 152.

---

[5] Dr. MacKillop produced a series of reports, which were entered into evidence as CYF Exhibits 5, 6, and 7. Dr. MacKillop's reports indicate that M.F.M., J.M.M., and S.L.M. began receiving therapy from her in March 2013. CYF Exhibit 5 at 1; CYF Exhibit 6 at 1; CYF Exhibit 7 at 1 (unpaginated). M.F.M. stopped receiving therapy from Dr. MacKillop in August 2014, and was scheduled to transition to a new therapist. CYF Exhibit 5, at 1.

Ms. Lori Cape testified that she provided R.A.M. mobile therapy from May 2013 until May 2014. *Id.* at 162. R.A.M.'s treatment goals were to "learn and demonstrate socially acceptable ways of coping with stress or anger along with learning to problem solve within the home that he was in and learning to adjust his behavior accordingly." *Id.* at 162. Ms. Cape explained that R.A.M. tended to use avoidance, anger, and eating as his primary coping mechanisms, but that he tried doing other things, including exercise and talking through his problems with his foster mother. *Id.* at 163. R.A.M. reported to Ms. Cape that his biological family was one of his "triggers," and described incidents of past abuse. *Id.* at 166-67.

Mother testified that she suffers from "severe depression, severe anxiety and a panic disorder," and that the condition of her former residence was a result of her depression. *Id.* at 268. When discussing the condition of the home, Mother denied that she left sexual devices lying out in the open, but stated that she kept them "secured," and that, "I believe the police officers put them there and took pictures of them." *Id.* at 285-87, 324. Mother also indicated that she has been diagnosed with post-traumatic stress disorder, and agoraphobia. *Id.* at 272. According to Mother, she is waiting to see a psychiatrist at T.W. Ponessa. *Id.* at 270. In the meantime, Mother is receiving mental health medications from her regular physician. *Id.* Mother stated that she also sees a counselor once per week. *Id.* Mother admitted that she recently missed "a couple" of appointments,

however. *Id.* Mother claimed that her current medications are working better than the combination of medications she was on at the time the Children were placed in foster care, and that she would be in a position to care for the Children if she were to obtain suitable housing. *Id.* at 272, 310. Mother stated that she is in the process of looking for a new apartment. *Id.* at 280. Mother also indicated that she visits with Father monthly, and that she expects that she and Father will "be back together" after he is released. *Id.* at 313.

Father testified that the condition of the home at the time the Children were placed in foster care was a result of Mother's depression, the Children's failure to assist her in cleaning the residence, and "a lack of my presence." *Id.* at 335, 337, 353. Father's also blamed the Children's educational deficiency on Mother's mental health. *Id.* at 339, 350. Father later admitted, "I could have stepped up and cleaned [the house] and didn't. Also their education, . . . I could have been more involved with that and made sure that they got the education that they needed." *Id.* at 344. Father explained that he pled guilty to simple assault because of an incident during which "I grabbed [J.M.M.] and yanked her off of her bed, her side hit the bed frame. And, unfortunately, she ended up hurting her rib." *Id.* at 344. Father admitted that J.M.M. suffered a rib fracture as a result of this incident. *Id.* at 349.

Father further testified that he suffers from high anxiety, obsessive compulsive disorder, and panic disorder. *Id.* at 336. Father stated that he participated in monthly counseling and took Prozac prior to the Children being removed from his care. *Id.* at 336-37. Father underwent a psychological evaluation while incarcerated, and he currently sees a psychiatrist as well as a counselor and is prescribed medications. *Id.* at 344-45. Father claimed that he intends on continuing with mental health treatment upon his release. *Id.* at 346. Father noted that he would be eligible for parole in March 2015. *Id.* at 331.

Accordingly, the record supports the finding of the trial court that Appellants' parental incapacity has caused the Children to be without essential parental care, control, or subsistence, and that Appellants cannot, or will not, remedy this incapacity. Mother lives in a one-bedroom apartment that is not suitable for the Children, and Father is incarcerated. Further, Mother has failed to demonstrate a serious commitment toward improving her mental health, as she recently missed "a couple" counseling appointments. Father has yet to demonstrate that he will continue with mental health treatment once released from incarceration. Also troubling is Appellants' hesitance to accept responsibility for their actions. As observed by the trial court, Father primarily blamed Mother's mental health and the Children for the condition of his previous home, and minimized his responsibility for fracturing J.M.M.'s rib. Similarly, Mother blamed her

mental health for the condition of the home, and alleged that the police conspired against her by placing her sexual devices in inappropriate locations and then taking pictures of them. While Appellants argue that their reunification efforts were thwarted by the no-contact order put in place by Judge Ness, the restrictions placed on Appellants' contact with the Children do not make up for the fact that neither parent is, or will be, capable of caring for the Children any time soon.

Additionally, we reject Appellants' claim that Judge Ness committed reversible error by failing to appoint separate counsel for both parents. The record reveals that Appellants initially applied for court-appointed counsel but the request was denied because Father made too much money working as a truck driver. Appellants then retained Charles J. Hobbs, Esquire, to represent them.[6] During the shelter care hearing, Attorney Hobbs requested that Judge Ness "consider" appointing separate counsel due to a possible conflict of interest. N.T., 1/11/13, at 6. However, Attorney Hobbs stated that Appellants "were willing to waive any conflict," and that, "[r]ight now I am comfortable with it." *Id.* Judge Ness reminded Attorney Hobbs that Appellants were not entitled to court-appointed counsel due to Father's income. *Id.* at 6-7. After Appellants were incarcerated in May 2013, Appellants were no longer able to afford Attorney Hobbs. This issue was

---

[6] Attorney Hobbs continues to represent Appellants in the instant appeal.

raised during a permanency review hearing on June 6, 2013, and addressed

by Judge Ness as follows.

> [Counsel for CYF]: I believe that the parents are asking that Attorney Hobbs no longer represent them and perhaps we could address that because he's private counsel.
>
> ATTORNEY HOBBS: They privately retained me, Your Honor, and given their current circumstances, they don't think my representation is necessary at this point.
>
> THE COURT: Well I don't know about the necessary part, but certainly -- they're not financially able to meet your -- we'll figure that out. Don't worry about that. Are they dissatisfied -- are you dissatisfied with him? You would still like him to be your attorney, however, you can't pay him because you're not working anywhere, sir; is that correct?
>
> [Father]: Right.
>
> THE COURT: As between the two of you, do you feel that he can adequately represent you together, one attorney for the pair of you, or do you believe that you each need to have your own attorney because one of you believes that the other is at fault or vice versa? No conflict with having one attorney?
>
> [Father]: No conflict.
>
> THE COURT: Are you requesting court appointed counsel?
>
> [Father]: I guess we have no choice, yes.
>
> THE COURT: All right, AND NOW, this 6th day of June 2013, Attorney Charles Hobbs is appointed to represent -- assuming he'll accept the appointment?
>
> ATTORNEY HOBBS: Yes, sir.
>
> THE COURT: -- both parents in this matter. Fixed it.
>
> ATTORNEY HOBBS: Thank you, Your Honor.

N.T., 6/6/13, at 7-9.

Thus, Father agreed that Attorney Hobbs could be appointed to represent both parents. Further, our review of the record does not reveal that Appellants, or Attorney Hobbs, requested separate counsel at a later date. Mother requested a new attorney during a hearing on September 11, 2014, but she did not suggest that Attorney Hobbs should not act as her counsel due to a conflict of interest. Instead, she complained that Attorney Hobbs had not been "aggressive" enough in representing her. N.T., 9/11/14, at 71. During the goal change and termination hearing, Mother stated that she previously had requested a separate attorney in the context of her criminal matter, but she did not state that Attorney Hobbs should not be representing her in the present case. N.T., 10/29/15-10/30/14, at 278. Thus, Appellants' claim merits no relief.

We next consider whether the trial court abused its discretion by terminating Appellants parental rights under Section 2511(b). Here, Appellants' brief contains no specific argument with respect to Section 2511(b). Thus, Appellants have waived any claims relating to that section. *See W.H.*, 25 A.3d at 339 n.3. However, to the extent Appellants' previous claims can be construed as a challenge to the termination of their parental rights under Section 2511(b), we offer the following analysis.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding

analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)).

In the instant matter, the trial court concluded that terminating the parental rights of Appellants would serve the needs and welfare of the Children. Trial Court Opinion, 1/9/15, at 32-35, 43-46. The court emphasized that none of the Children has a healthy or beneficial bond with Appellants, and that none of the Children wishes to return to Appellants' care. *Id.*

Again, our review of the record supports the trial court's conclusions. Ms. Jones testified that, to her knowledge, Appellants last saw the Children on December 21, 2012, which was the day they were removed from the

home. N.T., 10/29/14-10/30/14, at 44. Ms. Jones explained that the Children received a series of cards and letters from Appellants between late August or early September 2013 and October 2014. *Id.* at 48-49, 111. Some of Appellants' letters were not delivered to the Children, because CYF deemed them to be inappropriate. *Id.* at 49-50, 112, 193-94, 204-05, 208-09. M.F.M., J.M.M., and S.L.M. also wrote letters to Appellants. *Id.* at 47, 193, 210. When asked to summarize the content of these letters, Ms. Jones stated, "[t]hey were doing well [] where they are at. They want to stay where they are at. They don't get hit or yelled at like they did with mom and dad. They talked about school and being able to have friends." *Id.* at 193.

Ms. Jones reported that M.F.M. has requested that she be able to visit Father "behind glass," but only so she could "see the inside of the prison," and "tell her father, 'Look at me and see how well I am doing.'" *Id.* at 45. M.F.M. did not request visits with Mother. *Id.* Ms. Jones opined that M.F.M. has no parental bond with Appellants, as she has not seen them in nearly two years, and has had no contact with them outside of letters. *Id.* at 62. Ms. Jones later opined that M.F.M. has an unhealthy bond with Appellants. *Id.* at 69. M.F.M. "appears comfortable" in her foster home, and seems to

have "a normal parental relationship" with her foster parents.[7]  *Id.* at 70.

With respect to R.A.M., Ms. Jones stated that there was no indication that he

had a parental bond with either parent.  *Id.* at 74.  R.A.M. also did not

request visits with either parent.  *Id.* at 45.  R.A.M. "appears comfortable" in

foster care.  *Id.* at 75.

Ms. Jones further testified that J.M.M. does not have a "strong"

parental bond with Appellants, and noted that she has "been very adamant

that she does not want to return to her parents[′] care."  *Id.* at 77.  Ms.

Jones noted that J.M.M. sometimes does not get along with her foster

parents because of "normal 14 year old stuff" like not wanting to do her

homework, but that otherwise they "have a lot of fun together."  *Id.* at 78.

Similarly, Ms. Jones testified that S.L.M. does not have a parental bond with

Appellants, and explained that she "has been adamant as well that she does

not want to return to her parents[′] care."  *Id.* at 80.  Ms. Jones stated that

S.L.M. has "a strong bond with the foster family."  *Id.*  J.M.M. and S.L.M.

requested a visit with Mother in October 2014, but did not request a visit

with Father.  *Id.* at 45-46.

M.F.M. indicated that the termination of Mother and Father's parental

rights would be a "good thing," because "they messed up as parents.  They

shouldn't have the right to call us their kids when they didn't really treat us

---

[7] At the time of the termination hearing, J.M.M. and S.L.M. resided together in the same foster home, while M.F.M. and R.A.M. resided in their own separate foster homes.

like their kids." *Id.* at 244. M.F.M. explained that she is "a lot happier" in foster care. *Id.* at 246. M.F.M. stated that she would like to see Father, "but mostly to show him that everything he said about me when I was living with him is wrong," and that she would want no further visits with Father after that. *Id.* at 244, 247. M.F.M. noted that she has received letters from Mother and Father, and that she recently responded to Father's letter. *Id.* at 246. M.F.M. indicated that she most likely would continue to write to Father, "because I don't see that we will ever have that daughter-father connection or relationship." *Id.* at 246. M.F.M. stated that she last wrote to Mother "like a year ago," and that "I want nothing to do with her. I don't want her in my life anymore." *Id.* at 247.

R.A.M. stated that he would like to see Mother and Father "[a]s soon as possible." *Id.* at 237. He indicated that he would like to visit with Mother for "[m]aybe 20 minutes" at "McDonald[']s or something like that," and that he would like these visits to occur once per month. *Id.* at 237-38. R.A.M. stated that he "[n]ever" wants to live with Mother, but that he wants to "move on with the next family." *Id.* at 239. With respect to Father, the trial court noted that, "[y]ou told me before that you wanted to see your dad maybe with the glass," to which R.A.M. responded, "[y]eah, that is still with him." *Id.* at 237.

J.M.M. explained that she and her siblings "would get beat for stupid stuff" while living with Mother and Father, and recounted an incident during

which "we ate one of our dad's cereal bars that he takes to work and we got beat for that." *Id.* at 230. J.M.M. noted, "I want to see my mom but not my dad. I never had a good relationship with him." *Id.* at 231. J.M.M. clarified that she would want to see Mother "[o]nce every two months." *Id.* at 231. J.M.M. stated that she wants to be adopted, and that she recently wrote to Father "so I could convince him to sign the papers," because "I don't want to wait for like three years . . . when I get adopted. I don't want to be that old when I get adopted." *Id.* at 233.

S.L.M stated that that she would like to see Mother and Father, but later clarified that, "I want to see my mom but not my dad." *Id.* at 221, 226. S.L.M. noted that she would like to see Mother "for a visit," but that she does not want to live with Mother. *Id.* at 226-27. S.L.M. indicated that both Mother and Father have written to her, and that she has written to Mother and Father, but "[n]ot that often." *Id.* at 222, 225. S.L.M. explained that, in her correspondence with Mother and Father, she discussed "[e]verything and I am being baptized and that I want to be adopted." *Id.* at 222.

Thus, the record supports the finding of the trial court that the Children do not want to return to the care of Appellants. In contrast, the Children are comfortable in foster care, and slowly are making up for lost time by progressing in school, and by learning to cope with their past traumas. While the Children may still retain some bond with Appellants, it is

clear that this bond is outweighed by Appellants' parental incapacity, and by the Children's need for permanence and stability. *See C.D.R.*, 111 A.3d at 1220 (concluding that the appellant mother's bond with C.D.R was outweighed by the mother's "repeated failure to remedy her parental incapacity," and by C.D.R.'s need for permanence and stability).

Accordingly, because Appellants failed to preserve any challenge to the change of the Children's permanency goals to adoption and because the trial court did not abuse its discretion by terminating Appellants' parents rights to the Children involuntarily, we affirm the orders and decrees of the trial court.

Orders affirmed. Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/21/2015